IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| David B. Thompson, | Case No. 4:18cv2103 |
| Petitioner, | |
| -vs- | JUDGE PAMELA A. BARKER |
| | Magistrate Judge Carmen Henderson |
| Warden Brandeshawn Harris, | |
| Respondent | MEMORANDUM OPINION AND ORDER |

This matter is before the Court upon the Report & Recommendation ("R&R") of Magistrate Judge Carmen Henderson (Doc. No. 25), which recommends that the Petition for Writ of Habeas Corpus filed by David B. Thompson pursuant to 28 U.S.C. § 2254 be denied. Petitioner filed an Objection on August 3, 2021. (Doc. No. 26.)

For the following reasons, the Report & Recommendation (Doc. No. 25) is adopted and the Petition is denied.

I.  **Summary of Facts**

Thompson's habeas petition challenges the constitutionality of his conviction and sentence for aggravated murder and other charges in the case of *State v. Thompson*, Trumbull County Court of Common Pleas Case No. Case No. 2014 CR 00319. The state appellate court summarized the facts underlying Thompson's conviction as follows:

{¶ 9} The shooting incident giving rise to the indictment occurred at 207 Atlantic Street in Warren, Ohio, on April 7, 2014. A company called Pro Flooring is on the first floor of the building. The second floor houses three apartments. Roger Morgan and John Stiffler moved into Apartment B about one to two weeks before the incident. John Taylor had resided in Apartment A for approximately two years; appellant had resided in Apartment C for about the same length of time. Although pets were not generally permitted in the apartments, appellant had permission from the landlords to keep his companion/service dog, which had been assigned to him through the Veteran's Administration 15 years earlier.

{¶ 10} The following witnesses testified for the prosecution: Jason Polan, John Stiffler, John Taylor, Roger Morgan, Officer Michael Lynch, Lieutenant Martin Gargas, and Officer Thaddeus Stephenson. Appellant testified in his own behalf and called no other witnesses.

{¶ 11} Jason Polan, age 39, testified that he performs maintenance for Pro Flooring and the second-floor apartments. Polan stated he had multiple verbal confrontations with appellant during this time regarding late rent and other infractions: for example, he told appellant to remove an extension cord appellant was using to "borrow electricity" from Taylor in Apartment A. Polan also testified that he "must have" seen appellant's dog during this time, but he never had any contact with the dog.

{¶ 12} Polan testified that he arrived at the Atlantic Street building on the afternoon of April 7, 2014, with mailbox keys he had made for the new tenants in Apartment B (i.e., Morgan and Stiffler). He took the mail and the keys upstairs to Apartment B and knocked on the door. Polan testified that Morgan opened the door halfway, and he could see there was a dog in the apartment. He stated he did not recognize that it was appellant's dog, and he asked Morgan, "Who the F's dog is that?" He testified that "the door opened the rest of the way and I seen a gun come at me and shot at me." The bullet did not strike Polan. Polan stated appellant was holding the gun and did not say anything. He first testified appellant was about two arm lengths away from him but later, during cross-examination, stated appellant was about eight feet away from him. He testified that after the gunshot, "I grabbed the barrel of the gun and wrestled [appellant] into the apartment and forced him to the ground and took the gun away from him." Polan's hand was broken in the struggle.

{¶ 13} Polan testified he left the apartment, and appellant followed him down the stairs asking for his gun back. Polan then drove to the Warren City Police Department and turned in the gun; he told the officers he was not sure whether appellant pulled the trigger or whether the gun went off when he knocked the gun to the side in the struggle. His testimony, however, was that appellant "definitely shot at me before I grabbed the gun," and that Polan "didn't even see the gun until it went off." He testified that the narrative he told the police at the station was different from his trial testimony because he was nervous, surprised, anxious, and "everything wasn't really clear to me at that

2

time." Polan also testified that he carries a handgun, for which he has a concealed carry permit, but did not pull it out during the altercation with appellant.

{¶ 14} Roger Morgan, age 52, testified he had known appellant for about one year—prior to moving into Apartment B with John Stiffler. He testified that appellant was at their apartment on the afternoon of April 7, 2014, using their electricity to charge his computer. Morgan said he received a phone call from Polan about the mailbox key while appellant was there. Morgan testified that when appellant heard Polan was coming to the building, appellant said he was going to grab his gun because "they had a beef going on or whatever." Morgan went with appellant to appellant's apartment; Morgan saw the gun in Apartment C but did not see appellant bring it back to Apartment B. According to Morgan, appellant stated that if Polan "comes up, I'm going to shoot him." Morgan then walked to a nearby convenience store to get a soda for himself and a beer for appellant. Neither he nor Stiffler were drinking that afternoon, he testified.

{¶ 15} After he had returned, Morgan heard Polan arrive in the parking lot. Morgan stated appellant was sitting on the floor in the middle of the apartment. Morgan testified that he went halfway down the stairs in an attempt to stop Polan from coming up to the apartment, but he was too late. When Polan got to the top of the stairs, appellant's dog came out into the hallway, and Polan asked whose it was. Morgan said, "You know whose dog it is. It's [appellant's] dog." Polan gave Morgan the mail, and Morgan turned to enter the apartment and shut the door: "By the time I walked in the apartment, [appellant] was coming past me so I went around [appellant], you know, this way and then I hear the shot." Morgan's back was to them, and he did not see appellant with the gun before the shot. He had, however, seen the gun on the coffee table before Polan came up the stairs. He stated there was a scuffle into one of the bedrooms, and Polan was yelling at appellant to give him the gun. Polan eventually got the gun and walked out; appellant followed behind asking for his gun back.

{¶ 16} Morgan testified that when appellant was later arrested, appellant gave Morgan the keys to his apartment; Morgan then gave them to appellant's "wife—or his ex-wife or whoever it was." When appellant was released on bail, he accused Morgan of taking many items from his apartment. Finally, Morgan testified that he is on medication that affects his judgment and memory: two kinds of sleeping pills, anti-anxiety medication, and muscle relaxers.

{¶ 17} John Stiffler, age 73, testified that he and Roger Morgan had recently moved into Apartment B and had known appellant only for about a day or two. On April 7, 2014, appellant was in their apartment visiting Morgan, as the two of them had become friends. Stiffler testified that appellant brought his dog and a beer, and he sat down on the floor; Stiffler was in the kitchen when appellant came in. He said that neither he nor Morgan were drinking beer. Stiffler testified that Morgan got a phone call from Polan regarding the mailbox key.

{¶ 18} After appellant had been there for about an hour, Stiffler testified, Polan knocked on the door; Morgan opened the door, Stiffler was in a rocking chair, and appellant was still on the floor. He testified, "[Polan] come in and said here's the key to the mailbox. [Morgan] took the key, went and sat down on the other side of me and then [Polan] asked who in the hell does the dog belong to." According to Stiffler, appellant then turned around and grabbed a gun from under a floral arrangement on the coffee table, stood up, and shot without saying anything. The bullet hit the door of Apartment A across the hall. Stiffler testified that Polan then came in the apartment and grabbed appellant, they scuffled into Stiffler's bedroom, and then stopped. Neither one said anything, and Polan left with the gun.

{¶ 19} Stiffler testified he did not observe anything from Polan that would have been considered a threat. He also testified he did not see appellant enter the apartment with a gun, and he did not know whether appellant left and came back with a gun. At one point in his testimony, Stiffler indicated he could not remember certain details due to his age.

{¶ 20} John Taylor, age 55, testified he had lived in Apartment A for approximately two years. On April 7, 2014, he was in his apartment and heard an "explosion"; he looked out the door, and the hallway was "full of smoke out there from the gun." He saw appellant and Morgan, and then Polan came running out of Apartment B saying, "he tried to shoot me." Taylor stated appellant waited in Apartment B until the police arrived. Taylor testified that Polan yelled at appellant a lot and that Polan threatened to evict Taylor if he did not disconnect the extension cord running to appellant's apartment. Finally, Taylor testified that Polan always carried a gun; he would pull it out, flash it around, and do tricks with it.

{¶ 21} Officer Lynch, with the Shenango Township Police in Lawrence County, Pennsylvania, testified regarding the gun involved. He stated the same gun was stolen from a house in New Castle in 2012: a .44 caliber F.LLI Pietta single-shot ball and cap black powder pistol.

{¶ 22} Lieutenant Gargas, with the Warren City Police Department, testified that he spoke with Polan briefly when he turned in the gun. The lieutenant stated it was a single action gun, meaning it must be cocked before pulling the trigger in order to fire it. The gun was loaded when it was turned in and disassembled at the police station. Lieutenant Gargas also testified that he wrote out a "recovered firearm form that we send to BATF through our liaison officer describing persons and addresses attached to a weapon with a brief narrative." He testified that his brief written narrative was as follows: "Polan came to HQ. Stated [appellant] pointed the weapon at him and Polan grabbed it. A shot was fired. Polan got the gun away from [appellant] and came to HQ, headquarters, gun stolen from Shenango Township."

{¶ 23} Officer Stephenson, a patrolman with the Warren City Police Department, testified that he spoke with Polan at the station but did not take a written or recorded statement. Instead, he later wrote out a summary of their conversation based on notes he took while they were speaking. Officer Stephenson testified that Polan was "shaken up" and "his voice was a little shaky." He stated, "it almost appeared he was in shock, his voice was trembling. Just very nervous. Freaked out, I guess you could say." He testified that his report includes the following statement: "The gun then fired (Polan stated to me that he didn't know if Thompson pulled the trigger or if the gun went off because he had hit the gun hand to the side) sending a round into the door of Apartment A."

{¶ 24} Officer Stephenson arrested appellant in Apartment B and transported him to the station; he testified that he did not Mirandize or question appellant. On cross-examination, defense counsel asked Officer Stephenson a series of questions regarding his report of the conversation he had with Polan. Following each question, the officer was asked if he had written that statement down "verbatim," to which he responded he had. On redirect, the prosecutor elicited from Officer Stephenson that he did not know the meaning of "verbatim" and that the only actual quote in his entire summary related to Polan's question to Morgan about the dog.

{¶ 25} Appellant, age 55, testified in his own behalf. He stated he had been living in Apartment C for approximately two years and did not know Stiffler or Morgan before they moved in. The landlord allowed appellant's dog to live with him, who was certified by the Veteran's Administration as a companion animal for anxiety and depression; he owned the dog for 15 years. Appellant testified he had known Polan for about six months prior to the incident from seeing him around the building; he testified that Polan had seen appellant with his dog and had seen the dog in Apartment C. He opined that Polan was arrogant and threatening and stated Polan always kept his handgun in plain sight.

{¶ 26} Appellant testified that on the afternoon of April 7, 2014, he went to Apartment B with his dog, cane, computer, and charging cord; Morgan and Stiffler were both drinking beer. The three of them discussed appellant's collection of Civil War memorabilia, and appellant offered to show them his Civil War replica pistol. Appellant testified the pistol was given to him by the boyfriend of a previous tenant as collateral for a $50 loan; this occurred about seven months prior, and the man had not returned to claim the pistol. Appellant stated he retrieved the pistol from his apartment alone, brought it back to Apartment B, and set it on the coffee table while he waited for his computer to finish charging. He testified there was not a flower arrangement on the table, only a small vase, and that he did not hide the pistol. He said that Morgan then left for the convenience store and brought back a 40 ounce bottle of beer for appellant.

{¶ 27} Appellant testified he was not aware that Polan was coming to Apartment B; if he had known, he would not have been there at that time. He also testified he did not witness Morgan take a phone call, and he did not make any threats regarding Polan. Appellant stated Polan knocked on the door, the dog followed Morgan to answer the door, then "the MF thing went on about the dog." Morgan stepped back and said the dog belonged to appellant; Polan then threatened "to kick its ass out of the building." Appellant testified that, in response to the threat against his dog, "I just stood up and I got my pistol and pulled the door open a little farther so he could see me. And I pointed the pistol in his direction" in order to "maybe rattle him a little bit." Appellant testified he did not cock the pistol, did not have his finger on the trigger, and did not shoot at Polan. He described how the gunshot occurred:

> There was a struggle over the pistol. [Polan] immediately knocked it to the side pulling, I grabbed hold of and as I was pulling—it's a single action. It doesn't take a lot of pressure. When you pull the hammer back, it has to go all the way back for the trigger but if it doesn't go all the way back, if it's just back far enough when the hammer is released by hand or whatever reason, it only takes a little pressure to get a percussion cap to set the pistol off. That is why it went around [Polan] and went into the door because he had had it to the side.

{¶ 28} Appellant then testified that he was standing only three feet away from Polan when he initially pointed the pistol at him. Appellant also testified that he had been trained with firearms in the army, including pistols, and that he knows how to handle and shoot them. He said if he wanted to shoot him, there was "zero" likelihood he would have missed. Appellant explained that he eventually let go of the pistol during the struggle with Polan because he did not want the same thing, i.e. an accidental gunshot, to happen again. He followed Polan outside, asking for his gun back, but Polan pulled out of the driveway with the gun.

{¶ 29} Appellant testified that while he was sitting in the back of the police cruiser, he told Officer Stephenson it was an accident, but he had not been Mirandized. He further testified he did not know the gun had been stolen and that he had never looked very closely at the gun to determine whether it was loaded. He testified that the police gave his apartment keys to Morgan and many items were missing when he returned after making bail. He made a police report accusing both Morgan and Stiffler of theft.

*State v. Thompson*, 71 N.E.3d 1219, 1221-1225 (Ohio App. 11th Dist. 2016).

## II. Procedural History

In July of 2014, a Trumbull County Grand Jury indicted Thompson on (1) one count of felonious assault in violation of Ohio Rev. Code §§ 2903.11(A)(2) & (D)(1)(a), including a firearm

6

specification, and (2) one count of receiving stolen property in violation of Ohio Rev. Code § 2913.51(A) & (C). (Doc. No. 9-1 at pp. 2-4.) Thompson pleaded not guilty and his case proceeded to jury trial. (*Id.* at p. 38.) The jury found Thompson guilty of felonious assault, including the firearm specification, but not guilty of receiving stolen property. (*Id.* at pp. 5, 38.) On July 10, 2015, the trial court sentenced Thompson to an aggregate term of eight years incarceration. (*Id.* at pp. 5-7.)

On August 7, 2015, Thompson, through appellate counsel, filed a timely notice of appeal to the Eleventh District Court of Appeals (hereinafter "state appellate court"). (*Id.* at pp. 8-10.) In his appellate brief, filed on January 12, 2016, Thompson raised the following sole assignment of error:

1.  The Appellant's convictions are against the manifest weight of the evidence.

(*Id.* at pp. 14-24.) The State filed a brief in opposition. (*Id.* at pp. 25-35.) On September 30, 2016, the state appellate court found Thompson's argument was without merit and affirmed the judgment of the trial court, with one judge dissenting. (*Id.* at pp. 37-57.)

Thompson, through counsel, timely appealed to the Supreme Court of Ohio. (*Id.* at pp. 58-59.) In his memorandum in support of jurisdiction, Thompson asserted the following proposition of law:

1.  In reviewing whether or not a criminal conviction is against the manifest weight of the evidence, the reviewing court need not give total deference to the findings of trier of fact.

(*Id.* at pp. 60-70.) On June 21, 2017, the Supreme Court of Ohio declined to accept jurisdiction. (*Id.* at p. 93.)

On September 10, 2018,[1] Thompson filed a *pro se* Petition for Writ of Habeas Corpus in this Court and asserted the following ground for relief:

> I. In reviewing whether or not a criminal conviction is against the manifest weight of the evidence, the reviewing court need not give deference to [the] finding of the trier of fact, thus opposing due process, 14th [Amendment] to the Constitution.
>
> Supporting Facts: The evidence presented is vague, uncertain, conflicting, and fragmentary.

(Doc. No.1 at p. 6.) Thompson filed a brief in support of his Petition on September 27, 2018. (Doc. No. 4.) Therein, he again argued that his conviction was against the manifest weight of the evidence. (*Id.*) He also referenced sufficiency of the evidence, noting that "[a] claim that a conviction is supported by INSUFFICIENT EVIDENCE states a claim for habeas corpus relief, under the due process clause, set forth in *Jackson v. Virginia*, 443 US 307." (*Id.* at p. 3) (capitals in original).

Respondent filed a Return on April 16, 2019, in which he argued that the Petition should be dismissed because Thompson's manifest weight of the evidence claim was not cognizable on federal habeas review. (Doc. No. 9.) Thompson thereafter filed a Traverse and Application for Default Judgment. (Doc. Nos. 10, 11.)

On April 17, 2020, then-assigned Magistrate Judge George Limbert issued a Report & Recommendation ("R&R") that both the Petition and Application for Default Judgment be denied. (Doc. No. 12.) An Amended R&R was filed later that same day, which contained the same recommendation. (Doc. No. 13.) In particular, the Magistrate Judge recommended that the Petition

---

[1] Under the mailbox rule, the filing date for a *pro se* petition is the date that a petitioner delivers it to prison authorities. *See Houston v. Lack*, 487 U.S. 266 (1988). While the Petition herein did not arrive at the Court for filing until September 13, 2018, Thompson states that he placed it in the prison mailing system on September 10, 2018. (Doc. No. 1 at 12.) Thus, the Court will consider the Petition as filed on September 10, 2018.

be denied because Thompson's manifest weight of the evidence claim was not cognizable in federal habeas review. (*Id*.) The Magistrate Judge did not construe the Petition as raising a sufficiency of the evidence claim and, thus, did not consider whether Thompson's felonious assault conviction was supported by sufficient evidence under *Jackson v. Virginia*, 443 U.S. 307 (1997).

On May 7, 2020, Thompson filed a "Motion to Strike Magistrate Judge Report & Recommendation due to Untimeliness pursuant to Local Rule 16.3.1(h)(1)." (Doc. No. 14.) Therein, Thompson argued that the Amended R&R should be stricken as untimely. (*Id.*) He also raised several arguments in support of his assertion that the state trial court erred in his underlying criminal proceedings. (*Id*. at pp. 2-4.) Respondent did not file a response to Thompson's Motion.

On July 29, 2020, the Court denied Thompson's Motion to Strike the Amended Report & Recommendation as untimely but stated that it would address the substantive arguments raised in Thompson's Motion regarding his underlying state court conviction and sentence. (Doc. No. 15.)

On September 30, 2020, this Court issued a Memorandum Opinion & Order in which it declined to accept the Magistrate Judge's Amended R&R. (Doc. No. 16.) In relevant part, the Court found that Thompson's *pro se* Petition should be liberally construed as raising a sufficiency of the evidence claim under *Jackson, supra*. (*Id*.) The Court re-referred the matter to the Magistrate Judge with instructions to consider Thompson's manifest weight of the evidence claim as asserting a sufficiency of the evidence claim. (*Id*.)

Shortly thereafter, on October 5, 2020, newly assigned Magistrate Judge Carmen Henderson ordered Respondent to supplement the habeas record with the transcripts from Thompson's underlying state court criminal trial. In addition, the Magistrate Judge set a supplemental briefing

schedule regarding Thompson's sufficiency of the evidence claim. *See* Non-Document Order dated October 5, 2020.

On October 30, 2020, Respondent supplemented the habeas record with the transcripts from Thompson's state court trial. (Doc. No. 18.) Thompson timely filed his supplemental briefing on December 14, 2020.[2] (Doc. No. 21.) Under the Magistrate Judge's briefing Order, Respondent's response was due by January 28, 2021. *See* Non-Document Order dated October 5, 2020.

Respondent did not timely file its opposition to Thompson's supplemental briefing. *See* Non-Document Order dated June 14, 2021. Nonetheless, nearly six months later (on June 14, 2021), the Magistrate Judge *sua sponte* directed Respondent to file a response by no later than June 18, 2021. *Id*. Respondent then filed her Brief in Opposition. (Doc. No. 22.) Thompson filed a Motion to Strike Respondent's Brief as untimely, which the Magistrate Judge denied. *See* Non-Document Order dated July 7, 2021. Thompson subsequently filed a Reply to Respondent's opposition brief. (Doc. No. 24.)

On July 16, 2021, the Magistrate Judge issued a Report & Recommendation that Thompson's Petition be denied. (Doc. No. 25.) Thompson filed an Objection on August 3, 2021. (Doc. No. 26.)

## II. Standard of Review on Objections

Parties must file any objections to a report & recommendation within fourteen days of service. Fed. R. Civ. P. 72(b)(2). Failure to object within this time waives a party's right to appeal

---

[2] In his supplemental briefing, Thompson purports to raise the following additional ground for relief: "The Court committed plain error by charging Petitioner with a firearm specification on a civil war pistol, as it fails to meet the statutory definition and is in conflict with case law. Therefore, Petitioner's three (3) year specification charge, that involves an 'antique firearm' is unauthorized by law. Supporting an unauthorized sentence is in opposition with justice and the Fourteenth Amendment to the United States Constitution." (Doc. No. 21.) The Magistrate Judge declined to address this new ground as it was neither raised in Thompson's Petition nor authorized by this Court's September 30, 2020 Memorandum Opinion & Order. (Doc. No. 25 at p. 10, fn 2.) The Court agrees. Moreover, the Court notes that, in its September 30, 2020 opinion, the Court specifically rejected Thompson's attempts to raise this claim and further found that, even if it had been included in his original Petition, it would be subject to dismissal as procedurally defaulted. (Doc. No. 16 at p. 11 and fn 2.)

10

the district court's judgment. *See Thomas v. Arn*, 474 U.S. 140, 145 (1985); *United States v. Walters*, 638 F.2d 947, 949-950 (6th Cir. 1981).

When a petitioner objects to a magistrate judge's resolution of a dispositive matter, the district court reviews those objections *de novo*. Fed. R. Civ. P. 72(b)(3). Specifically, a district judge:

> must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

*Id*. "A party who files objections to a magistrate [judge]'s report in order to preserve the right to appeal must be mindful of the purpose of such objections: to provide the district court 'with the opportunity to consider the specific contentions of the parties and to correct any errors immediately.'" *Jones v. Moore*, 2006 WL 903199 at * 7 (N.D. Ohio April 7, 2006) (citing *Walters*, 638 F.2d at 949–50).

## III.     Analysis

The Magistrate Judge recommends that Thompson's sufficiency of the evidence claim be denied. (Doc. No. 25.) After conducting a review of the trial testimony of Morgan, Stiffler, Polan, and Thompson, the Magistrate Judge concludes that the evidence presented is sufficient to demonstrate that Thompson knowingly caused or attempted to cause physical harm within the meaning of Ohio Rev. Code 2903.11(A)(2). (*Id*. at p. 14-17.) In addition, the Magistrate Judge rejects Thompson's argument that the witness testimony against him was not credible, finding that "this court does not reweigh the credibility of witnesses." (*Id*. at p. 17.) Thus, the Magistrate Judge finds that Thompson's sufficiency of the evidence claim is without merit and recommends that the Petition be denied.

In his Objection, Thompson argues that the witnesses gave conflicting testimony regarding several issues, including whether or not Morgan was actually in the apartment when Polan arrived. (Doc. No. 26 at p. 3-4.) He also emphasizes Morgan's testimony that he is on medication that affects his memory, and Stiffler's testimony that he could not remember certain details due to his age. (*Id*.) Thompson argues:

> Proceeding on the presumption that the testimony as given, was true to the best of the witness's abilities to recall the events of April 7, 2014, are the conflicts and seemingly skewed perceptions enough to support the manifest weight and sufficiency requirements? There exists such total divergence in the testimony that the only thing actually corroborated was that a shot was fired. There is no agreement as to where the confrontation took place. Did Morgan leave and go halfway down the stairs? Did the appellant rush past Morgan to engage Polan at the door or did Morgan, answer the door, return to his seat adjacent to Stiffler? A comparative review of [the trial testimony does] not appear to be descriptive of the same incident with the exception of the names and the fact that a shot was fired.

(*Id*. at p. 4.) He asserts that he was "obviously convicted on evidence that was contradictory and not corroborative" and, therefore, "his conviction was based on an unreasonable determination of the facts" entitling him to relief under 28 U.S.C. § 2254(d)(2).[3] (*Id.* at p. 5.)

A petitioner who claims that the evidence at trial was insufficient for a conviction must demonstrate that, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

---

[3] Under § 2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(d)(2)). A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the trial court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528 (2003). A state court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's … determination." *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). The prisoner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt,* 571 U.S. at 18 (citing 28 U.S.C. § 2254(e)(1)).

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See also Scott v. Mitchell*, 209 F.3d 854, 885 (6th Cir. 2000). The role of the reviewing court in considering such a claim is limited:

> A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court. It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims. The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim.

*Matthews v. Abramajtys*, 319 F.3d 780, 788-89 (6th Cir. 2003) (internal citations omitted). Moreover, it is well established that "'attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence.'" *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002) (quoting *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir. 1984) *abrogated on other grounds by Buford v. United States*, 532 U.S. 59 (2001)).

Consistent with these principles, the Supreme Court has emphasized that habeas courts must review sufficiency of the evidence claims with "double deference:"

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, 'it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.' *Cavazos v. Smith*, 565 U.S. 1, ——, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011) (per curiam). And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U.S. 766, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 651 (2012). Under this standard, "we cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt," nor can "[w]e ... inquire whether any rational trier of fact would conclude that

13

petitioner ... is guilty of the offenses with which he is charged." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). Rather, a habeas court must confine its review to determining whether the state court "was unreasonable in its conclusion that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial." *Id*.

Upon careful review of the trial transcript, the Court finds that Thompson's felonious assault conviction is supported by substantial evidence.[4] At trial, Polan testified that, on April 7, 2014, he went to Morgan and Stiffler's apartment to give them their mailbox keys. When the door to the apartment was opened part of the way, Polan saw a dog and asked whose dog it was. Polan then testified that the door opened the rest of the way and Thompson immediately pointed a gun at him and shot at him:

> Q. And what transpired then and what happened?
>
> A: Well, the door opened the rest of the way because he was -- when he opened the door, he only opened the door about halfway, the door opened the rest of the way and I seen a gun come at me and shot [sic] at me.
>
> Q. All right. Could you see who was holding the gun?
>
> A. Thompson.
>
> \*\*\*
>
> Q. What happened after the door opened all the way and as Mr. Morgan was in the doorway and this Defendant opened the door?
>
> A. He shot at me. He shot at me and –

---

[4] The state appellate court explained the elements of felonious assault as follows: "To convict appellant of felonious assault, the state was required to prove, beyond a reasonable doubt, that appellant knowingly caused or attempted to cause 'physical harm to another * * * by means of a deadly weapon or dangerous ordnance.' R.C. 2903.11(A)(2). 'Attempt' occurs when a person, purposely or knowingly—'when purpose or knowledge is sufficient culpability for the commission of an offense'—engages 'in conduct that, if successful, would constitute or result in the offense.' R.C. 2923.02(A). 'A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist.' R.C. 2901.22(B)." *Thompson*, 71 N.E.2d at 1220.

> Q. How close was he to you? Where -- can you give us the parameters?
>
> A. Probably on the other side of this divider here.
>
> Q. I am going to stand –
>
> A. Probably from me to you.
>
> Q. Were basically both arm lengths away?
>
> A. Yes, sir.

(Doc. No. 18 at Tr. 274-275.) Later, Polan again testified that "[w]hen the gun pointed at me, it went off. As soon as he pointed the gun at me, he shot me – he shot at me." (*Id*. at Tr. 312.)

Defense counsel extensively cross-examined Polan. (*Id*. at Tr. 288-328.) In particular, defense counsel questioned Polan regarding inconsistencies between (1) the statement he made to the police on April 7, 2014, in which Polan stated that he did not know if Thompson pulled the trigger or if the gun went off accidentally; and (2) Polan's testimony at trial that Thompson shot at him and tried to kill him. (*Id*. at Tr. 321-328.) Polan acknowledged that his statement to the police differed from his trial testimony but stated that, when he spoke to police on April 7, 2014, he was shocked, upset, startled, and "not thinking clearly." (*Id*. at Tr. 280-281, 319.) Polan testified that, after reflecting on the incident, he believed that Thompson "definitely shot at me before I grabbed the gun." (*Id*. at Tr. 281.)

Polan's testimony was consistent with the testimony of John Stiffler. Stiffler testified that, when Polan arrived, Thompson "grabbed the gun, stood up and shot." (*Id*. at Tr. 350.) Specifically, he testified as follows:

> Q. When did you find out that Jason Polan was either coming or at your apartment?

> A. When he knocked on the door.
>
> Q. Okay.
>
> A. And we opened the door and David was sitting on the floor and Jason goes, "Whose dog is that." And David turned around and I had -- I have a floral arrangement on my coffee table. It was quite huge.
>
> \*\*\*
>
> Q. All right. What did you see when Jason Polan came to the door? What did you see this Defendant do?
>
> A. Right in front of me, I was sitting in my rocking chair.
>
> Q. All right.
>
> A. And he stood there and asked whose dog is this.
>
> Q. Who is he?
>
> A. Who said whose dog is this? Jason.
>
> \*\*\*
>
> A. …So Jason come in and Dave got underneath my floral arrangement, grabbed the gun, stood up and shot.
>
> Q. All right. Now –
>
> A. And it hit the door across the hall.

(*Id*. at Tr. 349-350.)

In light of the above, the Court finds that the evidence introduced at trial was sufficient to support the jury's findings as to each element of felonious assault, including that Thompson knowingly caused or attempted to cause physical harm to Polan. The jury was entitled to believe

16

Polan's and Stiffler's testimony that Thompson pointed the gun at Polan and fired at him.[5] While Thompson argues that the witness testimony in this case was contradictory and lacking in credibility, it is well established that the credibility of witness testimony is outside the scope of this Court's consideration of Thompson's claim of insufficient evidence. *See Matthews*, 319 F.3d at 788-89 ("An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims."); *Martin*, 280 F.3d at 618 (finding that "attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence.") Considering all of the evidence in the light most favorable to the State, this Court finds that there was sufficient evidence to convict Thompson of felonious assault.[6] Thompson points to no federal legal precedent requiring this Court, in the context of a challenge to the sufficiency of the evidence, to engage in the evidence-weighing that he requests.

Accordingly, Thompson's Objection is without merit and overruled. The Report & Recommendation is adopted, Thompson's sufficiency of the evidence claim is denied on the merits, and the Petition is denied.

**IV.    Conclusion**

For the foregoing reasons, Petitioner's Objections (Doc. No. 26) are OVERRULED. Accordingly, the Magistrate Judge's Report & Recommendation (Doc. No. 25) is ADOPTED, and

---

[5] In this regard, the instant case is distinguishable from *Nash v. Eberlin*, 258 Fed. Appx. 761 (6th Cir. 2007). In that case, the Sixth Circuit granted habeas relief on a sufficiency claim involving a felonious assault conviction because the "only evidence is that Nash brought out the gun to scare his wife, that he followed his wife into their daughter's room, and that the gun went off while Nash struggled with his son." *Id*. at 766. Based on those facts, the Sixth Circuit found that "it was objectively unreasonable for the Ohio Court of Appeals to find that a rational trier of fact could be convinced beyond a reasonable doubt that Nash knowingly attempted to cause physical harm to anyone through the use of a deadly weapon." *Id*. Here, by contrast, both Polan and Stiffler testified that Thompson not only pointed the gun at Polan but fired it in his direction.

[6] The Court reaches this conclusion both when applying the deferential standard of review set forth in the AEDPA and under *de novo* review.

17

the Petition (Doc. No. 1) is DENIED. Furthermore, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

**IT IS SO ORDERED.**

Date: August 10, 2021

 *s/Pamela A. Barker*
PAMELA A. BARKER
U. S. DISTRICT JUDGE